UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


CASE NO. 12-81416-CIV-DIMITROULEAS


CHRISTOPHER J. WEILAND,

        Plaintiff,

-vs-

PALM BEACH SHERIFF'S OFFICE, DEPUTY
CHRISTOPHER FLEMING,
Individually, DEPUTY MICHAEL
JOHNSON, Individually, and JOHN
DOE DEPUTIES, Individually,

        Defendants.

_____/


## THIRD AMENDED COMPLAINT FOR DAMAGES

Plaintiff, **CHRISTOPHER J. WEILAND**, by and through undersigned

counsel, hereby files his Third Amended Complaint for Damages and sues

Defendants, PALM BEACH COUNTY SHERIFF'S OFFICE,  DEPUTY

CHRISTOPHER FLEMING, Individually, DEPUTY MICHAEL JOHNSON,

Individually, and alleges:

### INTRODUCTORY STATEMENT

1.  This is an action for damages sustained by a citizen of the State of

Florida, United States, against RIC BRADSHAW and employee Sheriff's

Deputies of RIC BADSHAW, as Sheriff of Palm Beach County (hereinafter "PALM BEACH COUNTY SHERIFF'S OFFICE "a/k/a "PBSO"). DEPUTY CHRISTOPHER FLEMING unlawfully assaulted and battered Plaintiff CHRISTOPHER WEILAND with deadly force without justification and in violation of Plaintiff's civil rights. DEPUTY MICHAEL JOHNSON unlawfully assaulted and battered Plaintiff CHRISTOPHER WEILAND without justification and in violation of Plaintiff's civil rights. Plaintiff CHRISTOPHER WEILAND also brings an action against DEPUTY CHRISTOPHER FLEMING and DEPUTY MICHAEL JOHNSON, individually, for conspiring to cover up the wrongful shooting of CHRISTOPHER WEILAND. Plaintiff brings suit against PBSO as the supervisory entity responsible for the conduct, training and supervision of Sheriff's Deputies under its charge. Defendant, PBSO, failed to properly train Sheriff's Deputies in the appropriate methods of detaining and arresting citizens within the context of a Baker Act situation and the proper procedure and protocol with respect to the use of lethal force. Defendant, PBSO was deliberately indifferent by failing to conduct an adequate Internal Affairs investigation into the incident. By their deliberate indifference, PBSO failed to identify an illegal and improper shooting which would have caused the early release of the Plaintiff from jail or prevented his arrest and prosecution altogether. The actions of PBSO and

its employees resulted in CHRISTOPHER WEILAND being wrongfully incarcerated for a period of nearly two years pursuant to the malicious prosecution of Aggravated Assault charges, before ultimately being acquitted by a jury of his peers. Plaintiff brings State tort actions against PBSO for Assault and Battery, Intentional Infliction of Emotional Distress, and Malicious Prosecution for the actions of its Deputies under Florida Statute Section 768.28(9)(a).

## JURISDICTION

2. This action is brought pursuant to the laws of the State of Florida and the United States of America.

3. Jurisdiction and venue of this Court is proper because all State Courts have concurrent jurisdiction of Federal issues, all parties reside in Palm Beach County, Florida, and all events complained of occurred in Palm Beach County, Florida.

4. All conditions precedent to the maintenance of this action have been performed, waived or satisfied prior to its institution, including those set forth in Florida Statute Section 768.28.

5. This is an action for damages in excess of $15,000.00 exclusive of interest, costs and attorney's fees.

<u>PARTIES</u>

6.  At all times material hereto, CHRISTOPHER WEILAND ("WEILAND") was a resident of Palm Beach County and at all times relevant hereto was <u>sui juris</u>.

7.  At all times material hereto, Defendant, Deputy CHRISTOPHER FLEMING ("FLEMING"), was acting under color of law as a Deputy Sheriff, and in such capacity, as the agent, servant and employee of Defendant SHERIFF RIC BRADSHAW AS PALM BEACH SHERIFF ("PBSO").

8.  At all times material heeto, Defendant, Deputy MICHAEL JOHNSON ("JOHNSON"), was acting under color of law as a Deputy Sheriff, and in such capacity, as the agent, servant and employee of Defendant PBSO.

9.  At all times relevant hereto, Defendant BRADSHAW was the Sheriff of Palm Beach County Sheriff's Office ("PBSO"), Palm Beach County, Florida.  He was the employer of the aforementioned Defendant Deputies, and was responsible for their training, supervision and conduct.  BRADSHAW was also responsible for enforcing the rules and regulations of PBSO and for ensuring that the police personnel of PBSO obey the laws of the State of Florida.

4

FACTUAL ALLEGATIONS

**A.  Facts Surrounding the Shooting of CHRISTOPHER WEILAND**

10.  On or about April 6, 2007, WEILAND's father called the 911 emergency number expressing concerns for his son and advising that WEILAND was acting up, was "on drugs" (painkillers taken with perscription), and "probably has a gun."  The 911 operator was advised that WEILAND had been removed from the house three times before, and he needed to be removed again for the same behavior.  .

11.  Deputies FLEMING and JOHNSON were dispatched to the home of WEILAND's parents located at 4307 Fox Trace, Boyton Beach, Florida 33436.

12.  Based upon the 911 call and prior instances when police were called to commit WEILAND under the Baker Act, PBSO was on notice that WEILAND was mentally ill and needed to be handled by specially trained personnel. Nevertheless, contrary to accepted police protocol, there was no Crisis Intervention Team ("CIT"), or even a crisis negotiator, called for assistance. Neither Deputy FLEMING or JOHNSON had received special training in the protocols for safely disarming a mentally ill subject who needed to be taken to a mental health facility pursuant to the Baker Act.

5

13.   WEILAND's father met the Deputies outside of the house and advised them that his son was extremely agitated and had been yelling and screaming, and generally "carrying on" for approximately one hour.  He explained that he had threatened suicide and reiterated that he may have a gun.

14.   WEILAND was no stranger to PBSO, as he had been Baker Acted for his own protection at least twice by Deputies and, in fact, based upon information and belief, FLEMING himself had been called out to WEILAND's residence on at least one prior occasion for a domestic disturbance in which WEILAND had threatened to harm himself.  There had never been a credible threat to any other person as related by WEILAND's father to the Deputies in past encounters.

15.   PBSO was also familiar with WEILAND's history of bipolar disorder and prior physical trauma which made it necessary for him to maintain a regimen of powerful psychiatric and pain medication.

16.   After WEILAND's father met FLEMING and JOHNSON outside his home and briefed them, he escorted them inside.  He told them that WEILAND was in a back bedroom of the house at the end of the hallway.

17.   WEILAND's father reiterated to the Deputies that his son had been talking about killing himself and, as a result, may have a gun in his possession.

6

This information was conveyed to the Deputies in order to prevent them from overreacting to WEILAND should he actually be in possession of a firearm, not because he had threatened to use it for any other stated purpose than to commit suicide with it.

18.  FLEMING and JOHNSON immediately directed WEILAND's father to leave the home, drew their weapons and proceeded down the hallway.

19.  Contrary to sound police practices and proper protocol, FLEMING and JOHNSON, guns drawn and ready, crept to the rear bedroom at the end of the hallway without calling out or identifying themselves until they came upon WEILAND sitting on the edge of a bed looking down at a shotgun that lay loosely in his lap.

20.  Suddenly, without adequate warning or provocation, and against sound police practice and proper protocol, JOHNSON fired two rounds into WEILAND's body, literally blowing him off of his bed and critically injuring him.

21.  While WEILAND lay injured and bleeding, Deputy Fleming deployed his taser upon WEILAND.  Both Deputies then continued to physically beat and assault WEILAND before finally handcuffing one of his hands to a dresser, as his other hand had nearly been shot off.

22.  At no point did WEILAND ever raise the shotgun from his lap or point

7

it in the direction of the Deputies.

23.  In an effort to cover up their failure to follow proper protocol and overall gross negligence which resulted in the improper use of dealy force, FLEMING and JOHNSON, with the possible aid of other, as of yet unknown, John Doe Deputies, fabricated an elaborate story about WEILAND running from them into another room, grabbing a shotgun, sitting in a chair and then pointing the gun at the Deputies as they entered the doorway.

24.  FLEMING and JOHNSON further alleged that during the altercation, WEILAND discharged his shotgun, either at the Deputies or himself.  As a result, WEILAND was wrongfully charged with two counts of Aggravated Assault on a Law Enforcement Officer as well as other felonies and was falsely jailed for nearly two years while awaiting trial.

25.  During this time, WEILAND was left to languish in the hands of PBSO's correctional facilities where he was forced to heal from serious and life-threatening injuries without the aid of pain medication or compassionate healthcare.

26.  During his wrongful and extended incarceration, WEILAND was not only deprived of nearly two (2) years of his liberty, he also suffered multiple attacks by other inmates resulting in additional serious injuries, including a broken

jaw which went untreated and causes WEILAND serious daily pain to this day.

27.  WEILAND was eventually acquitted of all charges by a jury of his peers as FLEMING and JOHNSON's story fell apart at trial.  No blood was found in the office/bedroom they claimed WEILAND ran into before he armed himself and was subsequently shot.  No buckshot or other projectiles were recovered from a hole in the office wall FLEMING and JOHNSON claimed was from WEILAND's alleged shotgun blast.  In fact, during trial, it was revealed that JOHNSON had removed WEILAND's shotgun from the so-called crime scene to another unknown location, finally returning and placing it in the custody of crime scene investigators nearly 7-8 hours after the incident.  FLEMING and JOHNSON's overall version of events that day was unbelievable and inconsistent.

28.  Because of the actual notice of a mental illness, Deputies FLEMING and JOHNSON should have handled this situation according to accepted law enforcement protocol, which, at the outset, would have included but not been limited to, an understanding  of the proper procedures for taking a mentally ill individual into custody and transporting him to an appropriate facility for observation and examination without anyone being physically hurt.

29.  Deputies FLEMING and JOHNSON violated standard law enforcement procedures that mandate communicating with people with mental illness in an

attempt to determine what is bothering them.  There was no attempt to engage WEILAND in conversation after WEILAND's father had told them that WEILAND was in the back bedroom.  Instead, contrary to proper law enforcement training and procedures, which call for attempts to calm and diffuse the situation, they crept up to the back bedroom door with weapons drawn, and immediately fired when they saw WEILAND sitting on the edge of the bed holding a shotgun.

30.  Upon being advised by WEILAND's father where WEILAND was located, and the possibility that he was armed in order to shoot himself, the proper and acceptable procedure would have been to call for a Crisis Intervention Team, a crisis negotiator, or, at the very least, a knowledgeable supervisor, for assistance or guidance.  Contrary to sound police practices and proper protocol, Deputies FLEMING and JOHNSON did not take any of these actions.

31.  There were no exigent circumstances.  According to sound police practices and proper protocol, Deputies FLEMING and JOHNSON, once they had ascertained WEILAND's location in the house and the possibility that he was armed, they should have ascertained whether WEILAND was going to communicate with them.  If not, then they should have retreated immediately and called for someone who was trained to communicate with mentally ill individuals, which they clearly did not do.

10

32.  With no imminent threat, according to accepted law enforcement protocol, the Deputies should not have approached the back bedroom surreptitiously with their weapons drawn.  By sneaking up to WEILAND, they ran the risk of startling him into some action which could be interpreted as the manifestation of a threat, and cause an overreaction on their part.  In this case, that overreaction was the unjustified shooting of WEILAND.

**B.  BRADSHAW's and PBSO's Deliberate Indifference**

33.  PBSO has long been on notice that there is a high probability that its Deputies will come into contact with people with mental illnesses generally during Deputies' patrol and regular duties.  Numerous police shootings of people with mental illnesses, both in Palm Beach County and nationally, in addition to thousands of contacts between PBSO Deputies and people with mental illnesses, have placed PBSO on notice that there is a need for specialized training of Deputies to deal with people with mental illnesses, and for adequate and competent supervision of Deputies who come into contact with people with mental illnesses.  Further, the number of PBSO Deputy encounters with mentally ill people mandates a need to develop strategy, policies, procedures and practices that

will allow such encounters to end benignly, for all parties, in the appropriate seizure and transportation to mental health facilities rather than in the senseless shooting of a mental ill subject.

34.  Prior to April 6, 2007, Defendant BRADSHAW (in his official capacity) and PBSO were deliberately indifferent to, and permitted and tolerated a pattern of excessive and unreasonable use of force toward people with mental illnesses by PBSO Deputies, including, but not limited, to Deputies FLEMING and JOHNSON.  Although such uses of force were improper, the Deputies involved were not prosecuted, disciplined, or subjected to retraining, creating an atmosphere in which Deputies believed that such incidents were justified and proper.  Consequently, PBSO Deputies were caused and encouraged to believe that excessive and unreasonable use of force for mentally ill people would be permitted and tolerated by Defendant PBSO.

35.  The policies, customs and practices complained of include, but are not limited to, the following:

(A) Deliberate indifference in failing to train and retrain PBSO Deputies in the application of reasonable physical force on mentally ill individuals;

(B) Deliberate indifference in failing to train and retrain PBSO

Deputies in the proper methods of communication with mentally ill individuals;

(C) Deliberate indifference in failing to properly supervise PBSO Deputies in their encounters with mentally ill individuals;

(D) Deliberate indifference in failing to have supervisory officers properly reviewed for accurate use of force of incidents involving individuals with mental illness, with conclusions frequently permitted to be drawn on the basis of clearly incorrect or contradictory information;

(E) Deliberate indifference in failing to provide proper psychological and/or psychiatric monitoring, care, and treatment to PBSO Deputies in the field in order to determine which Deputies were prone to using excessive force so that Deputies with such a propensity could be dismissed from the PBSO or transferred to an area in which they would have a lesser chance to subject citizens of the State and County to such conduct;

(F) Deliberate indifference in failing to properly provide sufficient numbers of adequately trained officers, including on-duty sergeants, to be on duty at all times to deal with enforcement encounters with mentally ill people; and

(G) Deliberate indifference in failing to implement a program by which the proper policies would be in place such that law enforcement encounters with mentally ill persons would not result in injury or death to mentally ill

13

individuals.

36.  All of the above were with deliberate indifference for the very high number of encounters by PBSO Deputies with mentally ill people, which should have given rise to appropriate training and supervision, and preparation for such encounters.

37.  Defendants' deliberate indifference to, and permission and toleration of, the pattern and practices enumerated above by PBSO Deputies, were the moving forces causing the unjustified shooting of WEILAND and his injuries.

38.  At all times material to this action, Defendants were acting under color of State law and pursuant to PBSO practices, policies, and customs described above.

## C.  BRADSHAW and PBSO's Coverup

39.  Defendant BRADSHAW, in his capacity as the SHERIFF OF PALM BEACH COUNTY, maintained An Internal Affairs Division of PBSO that would conduct internal investigations into allegations of misconduct against his Deputies.  When there is a shooting by a PBSO Deputy Sheriff, an investigation is conducted as a matter of procedure.  The Internal Affairs investigators are personally authorized by BRADSHAW to conduct the investigation, and they report the results of that investigation to BRADSHAW.  BRADSHAW then

14

decides what, if any discipline or other action should be taken as a result of the

investigation.   The results of an Internal Affairs investigation carry the

imprimatur of Defendant BRADSHAW and the PBSO.  As such, any investigation

conducted by Internal Affairs is supposed to be fair and impartial, and not biased

in favor of the Deputies being investigated.  The community that elects the Sheriff

relies upon the results of Internal Affairs investigations to judge the performance

of PBSO and its supervision of its Deputies.

40.  A properly conducted Internal Affairs investigation is a search for the

truth.  The statements of the Deputies should be evaluated in the context of the

statements of other complainants and civilian witnesses, and a review of the

physical evidence.  An Internal Affairs investigation that does not evaluate in an

unbiased manner all of the evidence surrounding the incident being investigated,

but which investigation is directed and steered by an intention to protect the

reputations of the Deputies and cover up for any misconduct on their part causes a

result that is deliberately indifferent to the constitutional rights of those

complainants and victims of police shootings and misconduct.

41.  SHERIFF BRADSHAW and the PBSO have encouraged and fostered,

explicitly or tacitly, the policy and practice whereby Internal Affairs investigations

are conducted with the primary intent to cover up, excuse, conceal or otherwise

whitewash misconduct by Deputies, particularly the use of excessive force in incidents involving individuals with mental illnesses.

42.  The policies, customs and practices complained of include, but are not limited to, the following:

(A) Deliberate indifference in the conduct of investigations of incidents involving the use of excessive force against mentally ill individuals that discounts and rejects any version of the facts presented by the claimant and other civilian witnesses in favor of a version advanced by the Deputies under investigation.

(B) Deliberate indifference to the physical evidence in a case that may contradict the Deputies' version of the incident.

(C) Deliberate indifference to the complainant's version of events by using the investigation process to develop impeachment evidence that could be used to discredit the claim.

(D) Deliberate indifference to the constitutional rights under the Fourth, Fifth and Eighth Amendments, applicable to the States under the Fourteenth Amendment of the United States Constitution by conducting the investigation in such a way as to justify the seizure and/or arrest of a suspect without probable cause thereby justifying a deprivation of life, liberty, and

16

property, and the needless infliction of punishment.

43.  Through deliberate indifference displayed by BRADSHAW and the PBSO, as evidenced by the biased Internal Affairs investigations, particularly in investigations arising from allegations of excessive force applied against mentally ill individuals, encourages the Deputies involved in such incidents to believe that they will not be prosecuted, disciplined, or subjected to retraining, creating an atmosphere in which Deputies believe that such incidents are justified and proper. Consequently, PBSO Deputies are caused and encouraged to believe that excessive and the unreasonable use of force for mentally ill people would be permitted and tolerated by Defendant PBSO.

44.  Defendants' deliberate indifference to, and  toleration of, the pattern and practices enumerated above by PBSO Deputies, were the moving forces causing the unjustified shooting of WEILAND and his injuries.

45.  PBSO conducted their own woefully inadequate internal investigation of the incident which predictably found no wrongdoing on the part of FLEMING and JOHNSON.  PBSO's internal investigation was not designed to elicit substantive information with respect to the incident, the Deputies' version of events and how those alleged events compared to the physical evidence at the scene and the testimony of others.  But rather, was designed to cover up the illegal

17

and unconstitutional violations on the part of FLEMING and JOHNSON.

46. The State Attorney's Office, having nothing to rely upon but FLEMING and JOHNSON's fabricated testimony and the PBSO's sham internal investigation, likewise declined to take any action and pursued a criminal prosecution of WEILAND.

47. As a result of all of the Defendants' actions and inactions, the only avenue of remedy left for WEILAND is to pursue justice through the civil court system.

48. At all times material to this action, Defendants were acting under color of State law and pursuant to PBSO's practices, policies and customs described above.

49. WEILAND has retained counsel to vindicate his constitutional rights, who are entitled to a reasonable fee pursuant to 42 U.S.C. Sections 1983 and 1988.

## COUNT I

### 42 U.S.C., SECTIONS 1983 AND 1988 AGAINST FLEMING, JOHNSON AND JOHN DOE DEPUTIES INDIVIDUALLY

50. Plaintiff realleges and reavers the allegations of paragraphs 1-49 inclusive, and alleges further:

51.  At all times material herein, Defendants FLEMING, JOHNSON, and

JOHN DOE DEPUTIES were individual deputy sheriffs employed by RICK

BRADSHAW AS PALM BEACH SHERIFF.

52.  This Court has jurisdiction of claims arising under 42 U.S.C., Section

1983 and under the Constitution and laws of the United States, specifically the

fourth, Fifth, Eighth, and Fourteenth Amendments to the United States

Constitution, 42 U.S.C., Sections 1983 and 1988, 28 U.S.C., Sections 1331 and

1343, and especially under the Due Process Clause and the Equal Protection

Clause of the United States Constitution to address the deprivation under color of

law by any statute of any right, privilege or immunity secured by the United States

Constitution.

42 U.S.C., Section 1983 provides:

> Every person who under color of any statute, ordinance,
> regulation, custom or usage of any state or territory,
> subjects or causes to be subjected any citizen of the
> United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and the law,
> shall be libel to the party injured in an action at law,
> suit in equity or other proper proceeding for redress.

53.  FLEMING, JOHNSON, and JOHN DOE DEPUTIES committed the

acts described hereinabove in a gross disregard of WEILAND's constitutional

rights while acting under color of law, and specifically deprived WEILAND of his

constitutional rights, including but not limited to the following:

> (a) The right not to be subjected to punishment without due
> process of law under the Fifth Amendment;

> (b) The right to be free from cruel and unusual punishment
> under the Fifth Amendment; and

> (c) The right to be free from excessive police force and to be
> free from unreasonable seizure under the Fourth Amendment.

54.  These constitutional violations occurred by JOHNSON's and

FLEMING's acts and omissions in using excessive and unreasonable force against

WEILAND as more fully set forth above.  They violated WEILAND's Fourth,

Fifth, and Eighth Amendment rights, applicable to the States through the

Fourteenth Amendment and the United States Constitution, for which 42 U.S.C.,

Section 1983, provides a remedy.

55.  The force used against WEILAND was utilized pursuant to Defendant

PBSO's  policies, practices and customs as set forth above, and was unreasonable,

excessive, and violative of the Fourth, Fifth, and Eighth Amendments, applicable

to the States through the Fourteenth Amendment to the United States Constitution,

for which violations of 42 U.S.C., Section 1983, provides a remedy.

56.  That as a direct and proximate result of FLEMING, JOHNSON, and JOHN DOE DEPUTIES' constitutional violations against WEILAND, who suffered a loss of liberty by unjust incarceration, physical and psychological trauma, bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition.  The losses are either permanent or continuing and WEILAND will continue to suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendants FLEMING, JOHNSON, and JOHN DOE DEPUTIES for compensatory damages and costs, for reasonable attorney's fees pursuant to 42 U.S.C., Sections 1983 and 1988, in the prosecution of his claims for deprivation of constitutional and civil rights, and for trial by jury of all issues triable as of right by a jury.

## COUNT II

### 42 U.S.C., SECTIONS 1983 AND 1988
### AGAINST PBSO ONLY

57.  Plaintiff realleges and reavers the allegations of paragraphs 1-49 inclusive, and alleges further:

58.  This Court has jurisdiction of claims arising under 42 U.S.C., Section 1983 and under the Constitution and laws of the United States, specifically the fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C., Sections 1983 and 1988, 28 U.S.C., Sections 1331 and 1343, and especially under the Due Process Clause and the Equal Protection Clause of the United States Constitution to address the deprivation under color of law by any statute of any right, privilege or immunity secured by the United States Constitution.

42 U.S.C., Section 1983 provides:

> Every person who under color of any statute, ordinance, regulation, custom or usage of any state or territory, subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the law, shall be libel to the party injured in an action at law, suit in equity or other proper proceeding for redress.

22

59.   FLEMING, JOHNSON, and JOHN DOE DEPUTIES committed the acts described hereinabove in a gross disregard of WEILAND's constitutional rights while acting under color of law, and specifically deprived WEILAND of his constitutional rights, including but not limited to the following:

> (a) The right not to be subjected to punishment without due process of law under the Fifth Amendment;
>
> (b) The right to be free from cruel and unusual punishment under the Fifth Amendment; and
>
> (c) The right to be free from excessive police force and to be free from unreasonable seizure under the Fourth Amendment.

60.   At all times material hereto, Defendant PBSO permitted and tolerated a pattern and practice of allowing Sheriff Deputies to engage in inappropriate methods of detaining and arresting citizens within the context of a Baker Act situation by failing to property train them in proper procedure and protocol with respect to the use of lethal force.  By this pattern and practice, individuals, such as WEILAND, would be subjected to assault, battery, firearm and Taser weaponry usage inappropriately in deliberate indifference to their constitutional rights under the Fourth, Fifth, and Eighth Amendments, applicable to the States through the Fourteenth Amendment of the United States Constitution, 42 U.S.C., Section 1983, provides a remedy.

23

61.  Although placed on notice, PBSO failed to promulgate, implement and/or oversee clearly established laws or policies appropriate to the use of force by his Deputies that would reduce the risk of violence against the officers and facilitate the seizure of mentally ill persons and their transportation to a mental health facilities for observation and treatment.  PBSO's actions rose to the level of establishing a custom or policy through tacit, implied or express authorization, or was a display of deliberate indifference towards the use of excessive force during law enforcement investigatory detentions and seizures in the Baker Act context. The failure of PBSO to promulgate, implement, and/or provide procedures and oversight for the assault, battery, firearm and Taser weaponry usage during Baker Act seizures was the moving force behind the constitutional violation of WEILAND's civil rights.  Further, the unconstitutional actions as set forth above of FLEMING and JOHNSON were the result of PBSO's deliberate indifference to establish adequate procedures and oversight regulatory the conduct of seizure of mentally disturbed persons, such as WEILAND, when being detained under the Baker Act for psychological observation.

62.  PBSO did not adequately train or supervise its Sheriff Deputies in alternatives to the deployment of an appropriate and proportioned force during its investigatory operations, detentions, and seizures in the Baker Act context, and

was the moving force behind the constitutional violation of Plaintiff's civil rights as set forth above.  PBSO's failure to have adequately trained or supervised his employees or agents in the usage, limitation and proportionality of force during such investigatory detentions and seizures, resulted in a custom or policy through tacit, implied or express authorization, thereby causing the violation of clearly established law and an abridgement of constitutional rights to the Fourth, Fifth, Eighth Amendments applicable to the States under the Fourteenth Amendment to the United States Constitution, for which 42 U.S.C., Section 1983, provides a remedy.

63.  The deliberate indifference of PBSO as described above represents an official policy of PBSO, and the policymaking authority for PBSO was delegated to FLEMING, JOHNSON, and JOHN DOE DEPUTIES, and was the moving force in the constitutional violations suffered by WEILAND.

64.  As a direct and proximate result of Defendant PBSO's constitutional violations against WEILAND, the Plaintiff CHRISTOPHER WEILAND suffered a loss of liberty by unjust incarceration, physical and psychological trauma, bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and

25

aggravation of a previously existing condition.  The losses are either permanent or continuing and WEILAND will continue to suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant PBSO for compensatory damages and costs, for reasonable attorney's fees pursuant to 42 U.S.C., Sections 1983 and 1988, in the prosecution of his claims for deprivation of constitutional and civil rights, and for trial by jury of all issues triable as of right by a jury.

## COUNT III

### CONSPIRACY TO VIOLATE 42 U.S.C., SECTIONS 1983 AND 1988 AGAINST ALL DEFENDANTS.

65.   Plaintiff realleges and reavers the allegations of paragraphs 1-49 inclusive, and alleges further:

66.   At all times material herein, Defendants FLEMING, JOHNSON, and JOHN DOE DEPUTIES were individual deputy sheriffs employed by PBSO.

67.  This Court has jurisdiction of claims arising under 42 U.S.C., Section 1983 and under the Constitution and laws of the United States, specifically the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C., Sections 1983 and 1988, 28 U.S.C., Sections 1331 and 1343, and especially under the Due Process Clause and the Equal Protection

26

Clause of the United States Constitution to address the deprivation under color of law by any statute of any right, privilege or immunity secured by the United States Constitution.

42 U.S.C., Section 1983 provides:

> Every person who under color of any statute, ordinance, regulation, custom or usage of any state or territory, subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the law, shall be libel to the party injured in an action at law, suit in equity or other proper proceeding for redress.

68.  FLEMING, JOHNSON, and JOHN DOE DEPUTIES committed the acts described hereinabove in a gross disregard of WEILAND's constitutional rights while acting under color of law, and specifically deprived WEILAND of his constitutional rights, including but not limited to the following:

(a) The right not to be deprived of life, liberty or property without due process of law;

(b) The right not to be subjected to punishment without due process of law under the Fifth Amendment;

(c) The right to be free from cruel and unusual punishment under the Fifth Amendment; and

(d) The right to be free from excessive police force and to be free from unreasonable seizure under the Fourth Amendment.

69.  On or about April 6, 2007, after WEILAND had been shot and Tasered, FLEMING and JOHNSON, with the possible aid of other, as yet, unknown JOHN DOE DEPUTIES, entered into an agreement to fabricate an elaborate story about WEILAND running from them into another room, grabbing a shotgun, sitting in a chair, and then pointing the gun at them as they entered the doorway.

70.  As part of this agreement, FLEMING and JOHNSON falsely alleged that during the altercation, WEILAND discharged the shotgun, either at the Deputies or himself.

71.  In furtherance of that agreement, JOHNSON took the shotgun from WEILAND's residence to an unknown location where it was discharged.  It was then returned to the scene.

72.  FLEMING and JOHNSON agreed to present false police reports documenting their fabricated account of the incident.

73.  As an overt act, JOHNSON physically removed the shotgun from the WEILAND residence against all police procedure and protocol.

74.  As an overt act, FLEMING and JOHNSON, with the possible aid of other, as yet unknown JOHN DOE DEPUTIES prepared false incident reports documenting the fabrication.

28

75.  The agreement by FLEMING and JOHNSON, with the possible aid of others, as yet unknown, JOHN DOE DEPUTIES, to prepare false incident reports, tamper with and fabricate evidence of their violations of WEILAND's constitutional rights under the Fourth and Fifth Amendments, applicable to the States through the Fourteenth Amendments under the United States Constitution, for which 42 U.S.C., Section 1983, provides a remedy.

76.  FLEMING, JOHNSON, and other, as yet unknown, JOHN DOE DEPUTIES, knowingly and intentionally entered into this conspiracy to cover up and conceal the Constitutional violations more fully described above.

77.  Defendant PBSO has provided as an administrative remedy for citizens to lodge complaints against his Deputies for misconduct, including the use of excessive force in the course of their duties.  BRADSHAW, as the Sheriff of Palm Beach County is charged with supervising these investigations.  Citizens filing complaints with Internal Affairs have been led to believe by Defendant PBSO that the investigation will be fair and impartial, and if a Deputy is found to have violated the policies and procedures and/or the law and the Constitution they have sworn to uphold, they would be subjected to appropriate discipline.

78.  Prior to April 6, 2007, Defendant PBSO established a policy, whether explicit or tacit, written or unwritten that investigations of the use of excessive

29

force in the Baker Act context would perpetrate a coverup of official misconduct to the deliberate indifference to the constitutional rights of the citizen bringing the Complaint.  This policy would rise to the level of an agreement to absolve the Deputies' of responsibility thereby depriving the complainant of his administrative remedy.

79.  That the policy and past practices of the Defendant PBSO, through its Internal Affairs investigations into excessive force allegations in a Baker Act context are conducted in such a way as to whitewash any misconduct by the Deputies are known and understood by Defendant PBSO's Deputy Sheriffs.  This knowledge encourages them to engage in coverups, including false explanations of what occurred without fear of consequences.

80.  PBSO entered into this agreement immediately after the shooting when it initiated the Internal Affairs investigation.

81.  Pursuant to the policies and procedures promulgated by PBSO, BRADSHAW, as the Sheriff of Palm Beach County authorizes Internal Affairs investigations.  The purpose of the investigation is purportedly to determine the truth of what happened so that errant deputies could be disciplined or prosecuted for misconduct.  Citizens such as WEILAND expect the Internal Affairs Division to objectively, impartially and honestly investigate in good faith the truth, and not

to flinch or hesitate before recommending discipline of any deputy who has been found to have engaged in misconduct.

82. Through its Internal Affairs Department, PBSO conducted an investigation which was not focused on WEILAND's accusations, but sought to uncover misconduct on the part of WEILAND, and his father, who was at the scene at the time of the incident purportedly to justify a dismissal of the charges.

83. During the Internal Affairs investigation, PBSO agreed to accept the fabrications of FLEMING, JOHNSON, and JOHN DOE DEPUTIES without serious skepticism. BRADSHAW agreed not to question the discrepancies between the physical evidence at the scene and the false account of the incident provided by FLEMING, JOHNSON, and JOHN DOE DEPUTIES and thereby ratified their constitutional violations..

84. As an overt act, PBSO, through his Internal Affairs Division, issued a finding that absolved FLEMING and JOHNSON of any wrongdoing.

85. Pursuant to procedures promulgated by PBSO, BRADSHAW, as Sheriff of Palm Beach County and Defendant PBSO ratified and endorsed the finding of its Internal Affairs Division, absolving FLEMING and JOHNSON of any wrongdoing as a result of this incident.

86. Defendants intended that their agreement as set forth above would

31

frustrate, discourage and prevent WEILAND from seeking to vindicate his constitutional rights and allow the continuation of a criminal prosecution based on false testimony and evidence.  This agreement was the moving force for the constitutional violations alleged herein.

87.  As a direct and proximate result of the conspiracy between FLEMING, JOHNSON, JOHN DOE DEPUTIES, and PBSO to deprive WEILAND of his constitutional rights, CHRISTOPHER WEILAND suffered a loss of liberty by unjust incarceration, physical and psychological trauma, bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition.  The losses are either permanent or continuing and WEILAND will continue to suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant PBSO, FLEMING, JOHNSON, and JOHN DOE DEPUTIES for compensatory damages and costs, for reasonable attorney's fees pursuant to 42 U.S.C., Sections 1983 and 1988, in the prosecution of his claims for deprivation of constitutional and civil rights, and for trial by jury of all issues triable as of right by a jury.

## COUNT IV

### 42 U.S.C., SECTIONS 1983 AND 1988
### AGAINST PBSO ONLY

88.  Plaintiff realleges and reavers the allegations of paragraphs 1-49

inclusive, and alleges further:

89.  At all times material herein, Defendants FLEMING, JOHNSON, and

JOHN DOE DEPUTIES were individually Deputy Sheriffs employed by

BRADSHAW AS PALM BEACH SHERIFF (PBSO).

90.  This Court has jurisdiction of claims arising under 42 U.S.C., Section

1983 and under the Constitution and laws of the United States, specifically the

fourth, Fifth, Eighth, and Fourteenth Amendments to the United States

Constitution, 42 U.S.C., Sections 1983 and 1988, 28 U.S.C., Sections 1331 and

1343, and especially under the Due Process Clause and the Equal Protection

Clause of the United States Constitution to address the deprivation under color of

law by any statute of any right, privilege or immunity secured by the United States

Constitution.

33

42 U.S.C., Section 1983 provides:

> Every person who under color of any statute, ordinance,
> regulation, custom or usage of any state or territory,
> subjects or causes to be subjected any citizen of the
> United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and the law,
> shall be libel to the party injured in an action at law,
> suit in equity or other proper proceeding for redress.

91.  PBSO, FLEMING, JOHNSON, and JOHN DOE DEPUTIES committed

the acts described hereinabove in a gross disregard of WEILAND's constitutional

rights while acting under color of law, and specifically deprived WEILAND of his

constitutional rights, including but not limited to the following:

(a) The right not to be deprived of life, liberty or property without due
process of law under the Fifth Amendment;

(b) The right not to be subjected to punishment without due
process of law under the Fifth Amendment;

(c) The right to be free from cruel and unusual punishment
under the Fifth Amendment; and

(d) The right to be free from excessive police force and to be
free from unreasonable seizure under the Fourth Amendment.

92.  On or about April 6, 2007, after WEILAND had been shot and Tasered,

FLEMING and JOHNSON, with the possible aid of other, as yet, unknown JOHN

DOE DEPUTIES, began a course of conduct to conceal their misconduct by

fabricating an elaborate story about WEILAND running from them into another room, grabbing a shotgun, sitting in a chair, and then pointing the gun at them as they entered the doorway.

93. FLEMING and JOHNSON falsely alleged that during the altercation, WEILAND discharged the shotgun, either at the Deputies or himself.

94. JOHNSON took the shotgun from WEILAND's residence to an unknown location where it was discharged. It was then returned to the scene.

95. FLEMING and JOHNSON presented false police reports documenting their fabricated account of the incident.

96. The actions taken by FLEMING and JOHNSON, with the possible aid of others, as yet unknown, JOHN DOE DEPUTIES, to prepare false incident reports, tamper with and fabricate evidence of their violations of WEILAND's constitutional rights under the Fourth and Fifth Amendments, applicable to the States through the Fourteenth Amendments under the United States Constitution, for which 42 U.S.C., Section 1983, provides a remedy.

97. Defendant PBSO has provided as an administrative remedy for citizens to lodge complaints against his Deputies for misconduct, including the use of excessive force in the course of their duties. BRADSHAW, as the Sheriff of Palm Beach County is charged with supervising these investigations. Citizens filing

complaints with Internal Affairs have been led to believe by Defendant PBSO that the investigation will be fair and impartial, and if a Deputy is found to have violated the policies and procedures and/or the law and the Constitution they have sworn to uphold, they would be subjected to appropriate discipline.

98. Prior to April 6, 2007, Defendants PBSO has established a policy and pattern, whether explicit or tacit, written or unwritten that investigations of the use of excessive force in the Baker Act context would perpetrate a coverup of any misconduct by Deputies to the deliberate indifference of the constitutional rights of the victim of that excessive force. The procedures adopted by the PBSO would absolve the Deputies' of responsibility thereby depriving the victim of his administrative remedy.

99. That the policy and past practices of the Defendant PBSO, through its Internal Affairs investigations into excessive force allegations in a Baker Act context are conducted in such a way as to whitewash any misconduct by the Deputies are known and understood by Defendant PBSO's Deputy Sheriffs. This knowledge encourages them to engage in coverups, including false explanations of what occurred without fear of consequences.

100. PBSO conducted an investigation into the shooting to investigate whether any of the Deputies involved had committed misconduct.

36

101.  Pursuant to the policies and procedures promulgated by PBSO, any shooting by Deputy Sheriffs is investigated by its Internal Affairs Division. BRADSHAW, as Sheriff of Palm Beach County, authorizes and supervises the investigation.  The purpose is to determine whether there has been any misconduct.  BRADSHAW, as Sheriff decides what, if any, actions are deemed appropriate in response to the investigation by Internal Affairs.  Citizens such as WEILAND expect the Internal Affairs Division to objectively, impartially and honestly investigate in good faith the truth, and not to flinch or hesitate before disciplining police officers who have been found to have engaged in misconduct.

102.  Through its Internal Affairs Division, PBSO conducted an investigation which was not focused on WEILAND's accusations, but rather sought to uncover misconduct on the part of WEILAND, and his father, who was at the scene at the time of the incident purportedly to justify a dismissal of the charges.

103.  During the Internal Affairs investigation, PBSO accepted the fabrications of FLEMING, JOHNSON, and JOHN DOE DEPUTIES without serious skepticism.  PBSO did not question those discrepancies between the physical evidence at the scene and the false account of the incident provided by FLEMING, JOHNSON and JOHN DOE DEPUTIES.

104.  PBSO, through its Internal Affairs Division, issued a finding that absolved FLEMING and JOHNSON of any wrongdoing.

105.  Pursuant to procedures promulgated by SHERIFF RIC BRADSHAW AS PALM BEACH COUNTY SHERIFF, PBSO ratified and endorsed the finding of its Internal Affairs Division, absolving FLEMING and JOHNSON of any wrongdoing as a result of this incident and thereby ratified and protected their violations of WEILAND's constitutional rights.

106.  Defendant PBSO was deliberately indifferent to the fact that hiding the truth and covering up the misconduct of its Deputies would the criminal prosecution of WEILAND to proceed based on the false testimony and evidence, and that this cover-up was the moving force for the constitutional violations alleged herein.

107.  As a direct and proximate result of the policies and practices of the Defendant PBSO, CHRISTOPHER WEILAND was deprived of his constitutional rights and suffered a loss of liberty by unjust incarceration, physical and psychological trauma, bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition.  The

losses are either permanent or continuing and WEILAND will continue to suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant PBSO for compensatory damages and costs, for reasonable attorney's fees pursuant to 42 U.S.C., Sections 1983 and 1988, in the prosecution of his claims for deprivation of constitutional and civil rights, and for trial by jury of all issues triable as of right by a jury.

## COUNT V

### EXCESSIVE USE OF FORCE
### AGAINST DEFENDANT PBSO ONLY

108.   Plaintiff realleges and reavers the allegations of paragraphs 1-49 inclusive, and alleges further:

109.   On or about April 6, 2007, when WEILAND was in the process of being arrested and/or committed pursuant to a Baker Act investigation, Deputies from the PALM BEACH COUNTY SHERIFF OFFICE entered his residence where he was situated and committed aggravated batteries upon him by shooting him with a gun and Tasering him.

110.  This aggravated battery was committed with deadly weapons, to-wit: a firearm and Taser, and caused WEILAND serious bodily harm.

39

111.   The battery was without right or privilege.

112.   The acts and conduct of the Palm Beach County Sheriff's Deputies constituted excessive use of force.

113.   As a direct and proximate result of Defendant PBSO as Sheriff of Palm Beach County, and his Deputies,  Plaintiff CHRISTOPHER WEILAND suffered  physical and psychological trauma, bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition.  The losses are either permanent or continuing and WEILAND will continue to suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant PBSO,  for compensatory damages and costs, for reasonable attorney's fees pursuant to 42 U.S.C., Sections 1983 and 1988, in the prosecution of his claims for deprivation of constitutional and civil rights, and for trial by jury of all issues triable as of right by a jury.

## COUNT VI

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANT PBSO ONLY

114.   Plaintiff realleges and reavers the allegations of paragraphs 1-49 inclusive, and alleges further:

115.  Defendants BRADSHAW, as Sheriff of Palm Beach County and his Deputies,  intentionally caused WEILAND to be falsely jailed and prosecuted for crimes in an effort to cover up their unlawful conduct.

116.  The conduct of Defendant PBSO  was so outrageous as to go beyond all bounds of decency and be regarded as utterly intolerable in a civilized community and did in fact cause severe emotional distress.

117.  Plaintiff has complied with the notice provisions of Florida Statutes Section 768.28, which is a condition precedent to the filing of a State tort against Defendant PBSO.

WHEREFORE, Plaintiff CHRISTOPHER WEILAND respectfully requests this Honorable Court grant relief against the Defendant PBSO, in the form of compensatory damages and such other and further relief as this Honorable Court deems just and proper.

41

## COUNT VII

## MALICIOUS PROSECUTION AGAINST
## DEFENDANT PBSO ONLY

118.   Plaintiff realleges and reavers the allegations of paragraphs 1-49 inclusive, and alleges further:

119.   WEILAND was arrested and falsely charged with multiple counts of Aggravated Assault on a Law Enforcement Officer based upon the sworn testimony of employees of PBSO, DEPUTIES FLEMING and JOHNSON that WEILAND had placed them in fear of severe physical harm or death.

120.   Probable cause for these charges was based upon the intentional false statements made by FLEMING and JOHNSON.  Without those false statements, probable cause to arrest WEILAND for Aggravated Assault on a Law Enforcement Officer would not have existed.

121.   The subsequent legal proceedings and prosecution of WEILAND were instituted by Defendant PBSO through false testimony in arrest affidavits, Internal Affairs investigations, and pre-file conference testimony with the State Attorney's Office.  WEILAND was placed in legal jeopardy and forced to prove his innocence through a trial before a jury.

122.   After the sworn jury panel heard all evidence and testimony in this

matter, WEILAND was acquitted of all charges:  a clear and direct rebuke of Defendants' version of events.  This result constituted a <u>bona fide</u> termination of that proceeding in favor of WEILAND.

123.  The entire proceeding for Aggravated Assault on a Law Enforcement Officer lacked probable cause and was based on the entirely fabricated sworn testimony of FLEMING, JOHNSON, and other JOHN DOE DEPUTIES.

124.  The institution of these charges was done with malice and designed to cover up the wrongful shooting of WEILAND by putting him in prison for a crime he did not commit.

125.  The malicious prosecution caused WEILAND (who was still recuperating from severe, life-threatening injuries)to be incarcerated pre-trial, without bond, for a period of nearly two years, facing the possibility of a long prison term and causing extensive emotional, mental and physical damage.

WHEREFORE, Plaintiff CHRISTOPHER WEILAND respectfully requests this Honorable Court grant relief against the Defendant PBSO in the form of compensatory damages and such other and further relief as this Honorable Court deems just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY.

I HEREBY CERTIFY that on May 29, 2013, the foregoing document has been electronically filed with the Clerk of the Court using CM/EMF.

Respectfully submitted,

| | |
|---|---|
| ROBERT C. STONE, P.A. | CHARLES G. WHITE, P.A. |
| Co-counsel for Plaintiff | Co-counsel for Plaintiff |
| 33 S.E. Fifth Street | 1031 Ives Dairy Road |
| Suite 100 | Suite 228 |
| Boca Raton, FL 33432 | Miami, FL 33179 |
| Tel: (561) 338-4844 | Tel: (305) 914-0160 |
| Fax: (561) 338-4897 | Fax: (305) 914-0166 |
| Florida Bar No. 106117 | Florida Bar No. 334170 |

s/Robert C. Stone          

ROBERT C. STONE, ESQ.

S/Charles G.White          

CHARLES G. WHITE, ESQ.